IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **KENNETH E. MCAFEE and SHIRLEY MCAFEE husband and wife**, | : <br> : <br> : |
| Plaintiff, | : Consolidated Under <br> : MDL DOCKET NO. 875 |
| v. | : <br> : |
| **CROWN CORK & SEAL COMPANY, INC.** | : <br> : <br> : CIVIL ACTION NO.: 5:13-cv-06856-ER |
| Defendants | : <br> : ELECTRONICALLY FILED <br> : |

### DEFENDANT CROWN CORK & SEAL COMPANY, INC.'S INITIAL DISCLOSURES

Pursuant to Federal Rule of Civil Procedure 26(a)(1), defendant, Crown Cork & Seal Company, Inc., by its attorneys, makes the following initial disclosures:

### Preliminary Statements

1. Defendant has not yet completed its investigation of the facts relating to plaintiff's claims, nor has defendant completed its discovery or preparation for trial. Defendant reserves the right to rely on any facts, documents, or other evidence which may be developed or come to its attention subsequent hereto. Defendant's disclosures are set forth herein without prejudice to its right to supplement them should it discover additional information. Defendant reserves the right to supplement or amend these disclosures at any time prior to the trial of this action.

2.     By making the disclosures set forth herein, defendant does not waive any objections it may assert as to the relevance, admissibility, or discoverability of any documents or witnesses.

3.     Defendant does not waive any objections it may assert that documents or other information disclosed are protected from discovery by reason of the attorney-client and/or attorney work product privileges, or other privileges.

## Disclosures

a)     **Names, addresses and telephone numbers of individuals that disclosing party may use to support its claims or defenses, other than solely for purposes of impeachment, and the subjects of the information.**

RESPONSE:  Note:  Unless otherwise noted, all individuals identified below are employees of defendant and can be contacted through counsel for defendant or whose contact information is otherwise known to the parties.

A)    CHARLES R. CUSHING, PH.D., P.E., Naval Architect, Marine Engineer and Travel Consultant.

As President of C.R. Cushing & Company, Dr. Cushing has had the responsibility for the design, strategic plan approval and supervision of construction of vessels.  His work has involved new construction, conversion, repair and refurbishment of vessels.  He has also had responsibility for the preparation of the U.S.C.G. Tankerman's Manual and studies and projects involving marine operation, repair systems, vessel maintenance, coatings, pumping, safety, pollution prevention, materials handling, and air quality.

Dr. Cushing is expected to testify regarding the installation, use and composition of asbestos-containing insulation materials used aboard ships, the commercial availability and use of various insulation materials, during the relevant time periods, in vessel design, construction, conversion and maintenance, and/or the knowledge in the maritime industry of potential hazards of asbestos-containing materials during the relevant time periods, levels of ambient asbestos particles during vessel operations and government regulations and specifications pertaining to asbestos and vessel construction, maintenance, and operation.

B)    WILLIAM DYSON, PH.D.

Dr. Dyson is a certified industrial hygienist.  If a summary of his testimony and CV are required, counsel will provide them upon request.  Dr. Dyson is expected to testify regarding the state of the art regarding the knowledge of asbestos health hazards, the circumstances of the asbestos exposures claimed, and principles of industrial hygiene as applied to the circumstances of the claimed asbestos exposures.

C) ALFRED A. DERMODY

Alfred J. Dermody, Manager of Budget and Planning. Mr. Dermody will explain that Crown Cork has already paid or committed to pay asbestos claims arising from its merger with Mundet Cork in excess of the new statutory limit.

D) ROGER B. HORNE, JR., Rear Admiral USN (Retired) Naval Expert

Rear Admiral Horne is expected to testify regarding U.S. Navy records, particularly with regard to the specifications for use of asbestos-containing products aboard ships in various applications in marine engineering, including, without limitation, boilers, steam lines, insulation, and auxiliary systems.

In addition to his expert testimony, Rear Admiral Horne is expected to offer percipient testimony regarding research, development, design, engineering, and procurement practices of the U.S. Navy and regarding asbestos-containing materials, including, without limitation, amosite asbestos on specific U.S. Navy ships. Rear Admiral Horne is also expected to testify about the Plaintiff's opportunities for exposure to asbestos-containing materials onboard ships.

E) CHRIS W. JOHNSON, Financial Advisor

Mr. Johnson is expected to testify that the amount paid out in claims after adjusting for available insurance exceeds the value of Mundet Cork Corporation ("Mundet") as of February 10, 1966, adjusted for inflation. Mr. Johnson is expected to testify that the valuation conducted by Mr. Kevin Collins is reasonable and that the only way the value of Mundet could exceed the threshold amount is if the relevant stock market multiples exceeded those of publicly traded companies that were similar to Mundet as of the date of valuation (February 10, 1966).

Mr. Johnson will base his opinion on his education, knowledge, skill, training, experience, and his review of documents, pleadings, depositions, and testimony produced in this matter. Mr. Johnsonholds a doctorate of philosophy from the Lowry Mays Graduate School of Business at Texas A&M University. His major field of study was finance. The field of finance is centered on understanding the application of economic concepts and theories to solve problems that affect businesses. Finance is the discipline that supports valuation concepts and techniques. In addition to the field of finance, Mr. Johnson has advanced training in microeconomics, macroeconomics, econometrics, statistics, operations management and accounting. While with UHY and with previous employers, Mr. Johnson has been a consultant to a wide range of public and private organizations. As part of his consulting activities, he has served as an expert in lawsuits on a variety of issues related to the valuation of assets used in a wide variety of industries. Mr. Johnson has also taught both graduate and undergraduate courses in financial management, financial statements analysis, money and banking, managerial economics and international economics. He has served as an adjunct professor of finance at the University of Missouri-St. Louis, Texas A&M University, University of Houston-Victoria, and the University of St. Thomas. Mr. Johnson is also a Certified Licensing Professional.

In connection with this project, Mr. Johnson has reviewed publicly filed financial information, the affidavit and accompanying report of Mr. Collins, information related to the merger of Mundet Cork Corporation ("Mundet") into Crown Cork, financial information related to Mundet and Crown Cork; an insurance settlement agreement between Crown Cork and its insurers; and information on payments made by Crown Cork for related asbestos claims. Mr. Johnson may give additional opinions to rebut the testimony of any of Plaintiffs' witnesses or experts.

F)   RICHARD KRZYZANOWSKI

Mr. Krzyzanowski will explain the Crown Cork & Seal Company, Inc. merger with Mundet Cork Corporation, as well as events leading up to and following that merger. He will also testify concerning the 1989 reincorporation and consolidation of Crown Cork & Seal Company, Inc. He will testify concerning the 1985 settlement agreement between Crown Cork & Seal Company, Inc. and several insurers determining the aggregate liability insurance of Mundet Cork Corporation available to cover any successor asbestos-related claims arising from Crown Cork & Seal Company, Inc.'s merger with Mundet Cork Corporation. Mr. Krzyzanowski will testify about Crown Cork & Seal Company, Inc.'s payments and commitments to pay successor asbestos-related claims arising from the Mundet Cork Corporation merger. He will further testify about Crown Cork & Seal Company, Inc.'s business dealings in Texas, including Crown Cork & Seal Company, Inc.'s certificates of authority to do business in Texas. He will testify about the business of Crown Cork & Seal Company, Inc., what it did not include, as well as, what it did, and the acquisition of Mundet Cork Corporation as well as the sale of Mundet Cork Corporation's insulation business. Mr. Krzyzanowski will also testify about the asbestos claims alleged against Crown Cork & Seal Company, Inc.

G)   CAPTAIN CHARLES D. WASSON, USN (RET.)

Captain Charles Wasson is an expert in naval engineering, maintenance and repair, naval organizational structure, and in naval research. Capt. Wasson retired from the United States Navy in 1990, having had a 30 year naval career. Since 1990, he has been engaged in the private sector in the repair and modernization of various naval vessels.

Based upon his education, training and experience, Capt. Wasson may testify concerning the various classes and types of ships and/or submarines. He is acquainted with the various operating systems aboard such vessels and can provide descriptions of the ships, including their various departments and compartments, and where the various classes of shipboard personnel would have performed their duties. Furthermore, if appropriate naval records are available, Capt. Wasson may also testify concerning the employment of said vessel(s) during the relevant years of plaintiff's service aboard such vessel(s). Capt. Wasson may use demonstrative exhibits, including photographs, diagrams, and the like, to assist in the presentation of his testimony to the jury.

As a result of his supervisory duties in the United States Navy and as a Supervisor of Shipbuilding, Capt. Wasson is acquainted with the specific responsibilities assigned to the shipboard personnel serving aboard naval vessels. Based on his knowledge of naval organizational structure and command, he may testify regarding the division of labor and

responsibilities aboard naval vessels. Due to his experience in shipyards he is knowledgeable concerning the various trades and shops working aboard naval vessels. He is also knowledgeable and may testify concerning the duties of the various classes of naval personnel serving aboard naval vessels. Capt. Wasson will review various discovery materials in this case, including deposition transcripts and answers to interrogatories, and may comment and expand upon plaintiff's descriptions of his activities aboard the naval vessels on which he was assigned. He is familiar with and may rely upon the Naval Personnel Advancement in Rating Manual, Bureau of Ship's Technical Manual, Jane's Fighting Ships, and other technical maritime publications for some of the opinions he may express.

Capt. Wasson is also acquainted with naval product specifications and the products used aboard naval vessels. He is knowledgeable concerning the use and location of asbestos and non-asbestos products aboard naval vessels and may comment upon the likelihood of asbestos and non-asbestos products used aboard naval vessels for certain applications. He may testify as to which Navy rating of shipboard personnel worked with and around the various types of equipment and asbestos-containing products.

Based upon Capt. Wasson's training, research, experience and the availability of records, Capt. Wasson may testify concerning the naval vessel upon which the plaintiff served during the relevant time periods. Capt. Wasson may testify concerning the employments, major availabilities and maintenance of said naval vessel. He may give a detailed description of the naval vessel upon which plaintiff served, including its power plant, living quarters and other areas of the vessel that plaintiff may have frequented and/or had duties. He may testify that these were areas frequented by the plaintiff which exposed plaintiff to significant amounts of asbestos from friable asbestos-containing thermal insulation products. He may also testify concerning any overhauls or maintenance of the vessel which may have involved the disturbance of friable asbestos-containing thermal insulation products which further exposed plaintiff to asbestos fiber. Further, Capt. Wasson may discuss naval specifications for asbestos-containing products. Specifically, he may testify as to instances where asbestos-containing gasket and/or packing products were specified by the Navy and where non-asbestos substitutes for said products were not permitted by the Navy. He may discuss the various uses of non-asbestos-containing gaskets and packing products aboard ship and the likelihood some of the gasket and packing products which may have been used by plaintiff may not have contained asbestos. He may also describe the installation, removal and storage methods for asbestos-containing gaskets and packing products. He may also testify that asbestos gaskets and packing were usually wet upon removal, thus reducing the opportunity for asbestos fibers to be released. He may also testify regarding the prescribed methods to store gasket and packing products aboard ship. Additionally, based upon naval specifications, he may testify that numerous manufacturers of asbestos-containing gaskets and packing were authorized for use aboard naval vessels and, that in his opinion Crown was not an exclusive supplier of asbestos-containing gaskets or packing on said naval vessels.

Capt. Wasson may testify as to the authenticity and meaning of the records, specifications and other documents pertaining to the USS Cone. He may testify as to the history of the USS Cone including its employments, maintenance and overhauls. He may give a detailed description of the USS Cone including its steam plant, living quarters and after steering

area. He may testify that these were all areas which were frequented by plaintiff and in which he was exposed to large amounts of asbestos from friable asbestos-containing insulation products. He may describe the ship's major and availability overhauls during the time period plaintiff was assigned to the ship. He may opine that these overhauls involved the disturbance of friable asbestos-containing insulation products and that plaintiff was exposed to large amounts of asbestos fibers from these operations. He will testify as to the duties of various other personnel aboard the ship and how their work with friable asbestos-containing insulation products exposed plaintiff to large amounts of asbestos fibers.

Capt. Wasson may testify as to plaintiff's service aboard the USS Cone, including his job classifications and duties. He may describe the various pumps aboard the ship, how many pumps were aboard the ship and their functions, and personnel responsibilities. He may testify that gaskets and packing were used as seals on pumps. He may further testify that while asbestos-containing gaskets and packing may have been specified for some of the pumps on the USS Cone, non-asbestos gaskets and packing were used on many other pumps, including many of the pumps serviced by plaintiff. He may testify as to his opinion that while the USS Cone was employed, pump maintenance was limited in scope and that very few pumps were removed from service at any given time.

Further, Capt. Wasson may discuss the various asbestos-containing products aboard the USS Cone, including friable insulation. He may testify that plaintiff was exposed to asbestos fibers from these friable insulation products. He may discuss the Navy specifications for asbestos-containing products. He may testify that in those instances where an asbestos containing gasket or packing product was specified by the Navy, non-asbestos substitutes were not permitted. He may testify that the Navy authorized the purchase of asbestos-containing gaskets and packing from numerous manufacturers and, that in his opinion, Crown was not an exclusive supplier of asbestos-containing gaskets or packing on the USS Cone. He may discuss the various uses of non-asbestos-containing gaskets and packing on the USS Cone and may testify that many of the gaskets and packing used by plaintiff did not contain asbestos. He may describe the proper and prescribed methods of installation, removal and storage of gaskets and packing. He may further testify that gaskets and packing were removed whole or in large pieces and that removing and installing gaskets and packing was not a dusty process. He may testify that the gaskets and packing were wet upon removal, thus further reducing the opportunity for asbestos fibers to be released.

H)   THOMAS F. MCCAFFERY, MBA, Naval Expert

Thomas F. McCaffery is President of McCaffery & Associates, Inc., which engages in the analysis of U.S. Navy ship design, development, construction, and maintenance. He is an expert in the identification and analysis of U.S. Navy and Merchant ship design, development, construction, maintenance and repair records, plans, and photographs. In addition to this primary research, he also researches U.S. Navy personnel records and Navy/military specifications, qualified product lists and related records. This research, combined with his experience, training and education has provided him with a unique grasp of the Naval and maritime practices and policies from the 1940s through the 1970s. He received his B.S. from the U.S. Merchant Marine Academy and M.B.A. from Georgetown

University; he holds a diploma from the U.S. Naval War College's College of Command and Staff.  Mr. McCaffery previously served as a licensed officer aboard every type of vessel in the U.S. Merchant Marine, including Very Large Crude Carriers, Handy Sized Tankers, General Cargo and Dry Bulk Carriers.  He is a retired U.S. Naval Reserve Commander who has served as a consultant to the U.S. Navy.  He is also a member of the Society of Naval Architects.

Mr. McCaffery is expected to offer testimony regarding U.S. Navy and Merchant ship design, development, construction, maintenance and repair records, plans and photographs. Mr. McCaffery is also expected to offer testimony regarding U.S. Navy and military specifications for the use of asbestos-containing products aboard ship in a variety of applications in Marine engineering, including, without limitation, boilers, steam lines, insulation main propulsion and auxiliary systems.  He is further expected to testify regarding research, development, design, engineering and procurement practices of the U.S. Navy regarding asbestos-containing materials, including, without limitation, amosite asbestos on specific U.S. and Navy ships. He may further testify regarding how these documents are created, maintained, and archived, as well as their significance.  Mr. McCaffery may also testify about the plaintiff's or decedent's opportunities for exposure to asbestos-containing material including without limitation Mundet Cork products, if any, onboard United States Navy, U.S. Coast Guard and Merchant vessels.  Mr. McCaffery may provide testimony on his research of Qualified Product Lists with respect to the products used aboard various ships, as well as his research regarding documents relating to Navy and/or Coast Guard ships.

I)   FRED H. MERRICK, MARINE ENGINEER.

Mr. Merrick is expected to testify regarding the planning, engineering, and design of machinery and piping insulation onboard vessels, the historical use of asbestos-containing products onboard vessels, work practices in ship construction and repair, government regulations regarding insulation products, and the types of asbestos products required by various military and/or government specifications, and about the location and use of asbestos products on warships and on U.S. flag merchant vessels.

Mr. Merrick will testify about the amount of asbestos materials found on vessels, what asbestos products would have been replaced in an overhaul of such a vessel and the duties of various personnel during such an overhaul.  In addition, Mr. Merrick is expected to testify as to the origin, use, and type of regulations imposed on military and/or government specifications and the state of knowledge in the maritime industry and alternative insulation materials available during the relevant time period.

J)   TIM OURY, M.D., PH.D.

Dr. Oury will testify as to the pathological diagnosis of asbestosis, lung cancer, colon cancer and mesothelioma, and the association between asbestos fibers and the alleged disease process involving the plaintiff. He will further testify as to the contribution, if any, of exposure to Defendants' products in the causation of plaintiff's asbestos related disease. Dr. Oury will testify, in cases where sufficient lung tissue is available, as to the burden of

asbestos in plaintiff's lungs and its contribution, if any, in causing Plaintiffs asbestos-related disease. At this time, Defendant is unable to determine if Dr. Oury will testify until Dr. Oury has reviewed plaintiff's medical records and pathology materials.

K) DENNIS J. PAUSTENBACH, PH.D., DABT, CIH

Dr. Paustenbach is a board-certified toxicologist and certified industrial hygienist with more than 20 years of experience in occupational health, risk assessment, toxicology, and environmental engineering. His experience includes investigating the health effects of, exposure to, as well as the remediation of, carcinogenic and noncarcinogenic chemicals. He has published approximately 200 peer-reviewed articles and written nearly 40 book chapters in these fields. He also has given many lectures at universities on these issues and has conducted or supervised more than 700 risk assessments related to individuals, contaminated sites, consumer products, and many other scenarios. He has specialized in the areas of industrial and environmental toxicology, occupational health, historical state of knowledge regarding environmental issues, as well as ecological and human health risk assessment.

Dr. Paustenbach will offer opinions based on his professional qualifications, work experience, and knowledge of industrial hygiene toxicology, risk assessment and related fields as well as information he has been or may be provided regarding plaintiff and any alleged exposure to asbestos, including alleged exposure from Mundet Cork products.

Dr. Paustenbach may offer testimony concerning industrial hygiene in general and, in particular, industrial hygiene practices with respect to asbestos exposure in specific industries and crafts.  He may also testify as to the exposures at issue or others' exposure to asbestos or other substances.  He may testify as to potential of exposure, or lack thereof, of workers outside the immediate zone of use of asbestos containing products.  He may testify concerning the development and use of threshold limit values and the promulgation of regulations, both on a state and federal level, concerning the use of asbestos and asbestos exposures in occupational settings. He may offer testimony regarding the US Navy's knowledge. He may also offer testimony concerning air-monitoring regarding the US Navy's knowledge.  He may also offer testimony concerning air-monitoring/air-testing in in general, and, in particular, air-monitoring for levels of asbestos present in various occupational settings. He may also testify concerning state of the art medical, technical and scientific knowledge at times relevant to this lawsuit with respect to asbestos, asbestos exposures and related industrial hygiene practices, generally and specifically with respect to exposures associated with the use of asbestos-containing products. He may offer any or all of the following opinions, among others: asbestos-related disease exhibits a dose-response relationship; low airborne concentrations of asbestos, such as those associated with the ambient background environment, are not believed to pose an increased risk of asbestos-related disease; the length, dimension and chemical nature of asbestos fibers are known to play a role in the etiology of disease; regulatory approaches for estimating risks due to exposure to carcinogenic chemicals, including asbestos, rely on dose extrapolation models which are intended not to underestimate the risk and, in nearly all cases, can be expected to significantly over predict the actual risks at doses to which most persons are exposed; from the 1940s to the 1960s results of studies the US Navy conducted of shipyard and ships.

L)   ADM. DAVID SARGENT

David P. Sargent, Jr. is a retired Rear Admiral of the United States Navy. He began his Navy career in 1967, after receiving a Bachelor of Science degree in Mechanical Engineering from Cornell University. Upon commissioning in the Navy, Admiral Sargent attended the Pacific Fleet Chief Engineer School in a course focused on the maintenance of engineering plants of World War II era steam propulsion ships. Admiral Sargent also has a Master of Engineering degree from the Naval Postgraduate School, Monterrey, California, in 1974. In addition, Admiral Sargent is a licensed Professional Engineer with extensive operational experience in ship engineering, ship maintenance, and at-sea operations.

Following twenty years of operational experience in warships, Admiral Sargent held a variety of program and technical management positions in the Naval Sea Systems Command program offices responsible for the design, construction, introduction, and support of new warships from 1988 until his retirement in 1999. Upon selection to Rear Admiral in 1994, he was assigned as Commander, Naval Surface Warfare Center, a diverse organization of research laboratories and engineering stations responsible for research and development of all technical aspects of U.S. Navy surface ships and submarines. His final tour before retirement was Program Executive Officer (PEO) for Aircraft Carriers and Expeditionary ships. In this position, he had the overall responsibility of all matters relating to both the technical and programmatic details of construction and delivery of new aircraft carriers, amphibious, and special purpose ships to the Navy.

Admiral Sargent is now President of Sargent Enterprises, Inc., which includes two companies serving the marine industry, SEI Associates, a consulting business that provides technical and management advice to marine industries; and SEI Marine Technologies, a company that operates and maintains various test and demonstration craft for research and development companies involved in developing new equipment and hull forms for future high performance ships.

Admiral Sargent has served for many years in active leadership of the American Society of Naval Engineers (ASNE), and in 2001 was elected to serve as president of that organization. He is also a member of the Sigma Xi Engineering Honorary Society, the American Society of Mechanical Engineers, and the Cornell Society of Engineers. Admiral Sargent has been or will be provided with product exposure information and other case specific data filed or furnished in this case, including, but not limited to, depositions, complaints, amended complaints (if any), answers or responses to interrogatories and other discovery provided by plaintiff and/or other parties or third parties, and certain Crown Cork documents/records. Admiral Sargent has been or will be provided with drawings, specifications, and other data accessed from a variety of sources housing archives of United States Government documentation. He will also be provided with an opportunity to interview Crown Cork's witnesses, as may be needed or appropriate with respect to any business or communications Crown Cork may have had with the United States Government.

### NAVAL VESSEL MISSION/PURPOSE.

Admiral Sargent will offer testimony with respect to the construction, operation, objectives, and mission of United States Government ships, particularly within the times of the potential exposures alleged by plaintiff in this case. Admiral Sargent will testify that, among other things, U.S. Government vessels were designed and constructed to perform, along with its integral crew, certain general and specific tasks. For example, in the case of warships and their crew, vessels were designed and constructed to deliver an array of weapons and a combat capable force to inflict or threaten to inflict grievous harm and damage to an enemy of the United States.

### U.S. NAVY SHIP DESIGN, CONSTRUCTION, AND REPAIR.

Admiral Sargent will testify with respect to various aspects of Naval architecture and marine engineering, including without limitation, ship design, construction, maintenance, and repair. The chain of command within the U.S. Government concerning ship construction involves several layers of authority, particularly in the lines of command for technical and contractual control over Navy ship design, construction, maintenance, and repair.

Ultimately, the Secretary of the Navy has authority over the Navy including Navy shipbuilding design, construction and operation. Immediately below the Secretary, as has been the case at least since the creation of NAVSEA, is the Chief of Naval Operations ("CNO"), to whom NA VSEA reports. Prior to the inception of NAVSEA, the Navy Bureau of Ships (BUSHIPS) controlled all Navy ship design and construction and reported to the CNO as well as a civilian Assistant Secretary of the Navy.

Under the command of NAVSEA, as was the case with BUSHIPS before it, the Navy's design and shipbuilding organization included several divisions and levels of authority concerning ship design, construction, maintenance, repair, and inspection. The Chief of BUSHIPS (and later NA VSEA) and the Chief of the Bureau of Supply and Accounts maintained and directed technical and contractual control over shipboard equipment and products. Each of these two organizations had oversight responsibility concerning equipment and products built for installation or use aboard Navy vessels.

### MILSPECS.

Prior to the Second World War, the quality and type of product delivered for use on U.S. Government ships was generally not standardized. As a result, equipment and products manufactured and supplied for the Navy may have varied widely in terms of quality and performance. In order to assure quality and to promote efficiency and effectiveness, the Navy determined that a strict, explicit set of written standards were necessary to control the specifications of all equipment and products manufactured and supplied to the Navy. As a result, the Navy developed an engineering process for the creation and subsequent modification, as needed, of written specifications outlining all requirements for equipment and products manufactured and supplied for the Navy's use. Such specifications covered, for example, not only the physical requirements of the equipment and products, but also, as

will be seen below, the nature and the content of written instructions, directions, and warnings that would accompany such equipment and products.

BUSHIPS, and later NA VSEA, maintained the responsibility to develop the written specifications and standards for the manufacture and supply of equipment and products used in the construction, maintenance, and repair of Navy vessels. Specifications for any equipment and products intended for use aboard a U.S. Navy ship, now known generally as "MilSpecs," were drafted, approved and maintained by the Navy. MilSpecs are intended to address shipboard equipment and products requirements. Once promulgated, only the Navy could make any changes or modifications to those specifications. NAVSEA maintained and controlled the MilSpecs largely because it had superior knowledge of the demands and requirements of combat-ready vessels.

In the context of ship construction, NA VSEA or BUSHIPS prepared contract specifications, which incorporated the MilSpecs. From time to time, privately owned shipyards or marine design professional firms also prepared contract specifications incorporating Navy MilSpecs. Whether issued by the Navy or by private entities, these specifications reflected the contemporaneous state of the art and the special needs of naval vessels, including considerations for the safety and protection of the crew aboard fighting ships.

### APPLICABILITY AND ENFORCEABILITY OF MIL SPECS.

MilSpecs, and their predecessors, were communicated to vendors when the Navy (or private entities, such as shipyards or design professional firms) issued Requests for Proposal for the manufacture or supply of certain equipment and products. Admiral Sargent will testify and offer opinions with respect to the creation, formation and enforcement of MilSpecs pertaining to ship design, construction, maintenance and repair activities, including without limitation, an explanation of how vendors manufacturing or supplying equipment and products for ultimate use aboard Naval vessels were governed and controlled by the Navy's specifications. He will further testify and offer opinions with respect to those MilSpecs, which were applicable to vendors, including MilSpecs applicable to a wide array of Navy ship products or applications, including by way of example, insulation products, pumps, gaskets, and packing.

Compliance with the standards and specifications required for equipment and products supplied for ultimate use aboard U.S. Government vessels was directly monitored by Naval Machinery Inspectors under both of the following divisions: (a) the Machinery Inspectors under Naval Supply worked on-site at the vendor's manufacturing facility; and (b) the Machinery Inspectors under BUSHIPS (later NA VSEA) carried out their responsibilities at the shipbuilding yards. Moreover, after the mid-1960s, it was common for Directors of both the Machinery and Propulsion Equipment Groups and the Head of the Steam Turbine Branch to inspect the manufacturing process at a plant where equipment was manufactured to Navy specifications. The Machinery Inspectors ultimately worked for the Secretary of the Navy or the Secretary of Defense, or its predecessor the Secretary of War.

These Inspectors exercised primary, front line control and direction over the work performed for the Navy by original equipment manufacturers (OEMs), regardless of

whether the equipment was being constructed or supplied pursuant to a Navy or private contract. As a Navy engineer, Admiral Sargent was often called upon to assist inspectors in determining conformance of the shipbuilder and the vendors to drawings and specifications prior to acceptance.

NAVSEA and BUSHIPS maintained engineers highly qualified in specialty areas such as valves, steam turbines, gas turbines, reduction gears, ship propulsion, and auxiliary equipment. In addition, because a majority of the Navy's surface vessels operating in the time period prior to the decade of the 1970s used steam-powered engines as a principal form not only of propulsion, but also as a source of power in general, NAVSEA and BUSHIPS further maintained significant expertise in the important area of heat transfer and insulation particularly the use of certain asbestos fibers as an insulation material. These Navy engineers had control over the technical aspects of military specifications that concerned their area of expertise. In addition, NAVSEA and BUSHIPS have always had an Engineering Standards Group to help manage the large number of specifications and contract plans, as well as amendments and updates that exist at any given time. Changes to specifications were continually under review as new technology, construction techniques, or other considerations evolved.

   OEM WARNINGS.

The U.S. Government had precise specifications as to the nature of any 22 communication or directions affixed to or made a part of any equipment and products supplied by OEMs for ultimate use aboard Navy vessels. Admiral Sargent will testify and offer opinions that OEMs would not have been permitted, under the specifications, associated regulations and procedures, nor under the actual practice as it evolved in the field, to vary or to deviate in any respect from the Navy specifications in supplying equipment and products, including affixing any type of warning or caution statement to equipment and products intended for installation onto a Navy vessel, beyond those required by the Navy without prior discussion and express approval by the Navy.

The U.S. Government had precise specifications as to the nature of written materials to be delivered with equipment supplied by OEMs to the Navy, which included engineering reference materials to assist the engineering staff in servicing and maintaining such equipment. These written materials are and were generically known as "instruction books" or "technical manuals." Through MilSpecs, the Navy required that every piece of equipment be supplied with a defined number of copies of one or more instruction books or technical manuals. Navy personnel participated intimately in the preparation of this kind of information in a standardized format used by the Navy. These manuals included safety information to the extent- and only to the extent- directed by the Navy. OEMs would not have been permitted, under the specifications, associated regulations and procedures, nor under the actual practice as it evolved in the field, to include any type of warning or caution statement in instruction books or technical manuals, beyond those required and approved by the Navy without prior discussion and approval by the Navy.

Generally, the U.S. Government had ultimate control over the nature and type of any equipment- and product-related safety warnings communicated to Navy personnel. Moreover, the Navy made the final determination as to crew safety considerations with

respect to the use, handling or operation of equipment on Navy vessels. Admiral Sargent will testify with respect to the general exchange of information and/or communications between the U.S. Government and OEMs with respect to the specification and use of asbestos used in Navy equipment, as well as the Navy's further development and modification of the pertinent specifications in the late 1980s and early 1990s.

Prior to the mid-1960s products manufactured for Navy use was reviewed and inspected by Navy personnel in the OEM's plant. Since the mid-1960s, the OEM's product, as well as in some cases its methods of production, has been reviewed and inspected by a combination of Navy and Department of Defense personnel. In the shipbuilding yards, the construction or repair work has always been reviewed and inspected by Navy personnel. In many instances, Admiral Sargent personally inspected equipment to verify conformance with the requirements specified, although officers and other Navy personnel under the Admiral's command or the command of NAVSEA or BUSHIPS had more direct oversight and responsibility for these functions.

### Navy Control of Use of an OEM's Products.

The U.S. Government's precise specifications also applied to the use of an OEM's product. Stated another way, OEMs had no control over the manner in which their products would be handled, installed, or used by the Navy in the construction or operation of a Navy vessel. Moreover OEMs had no ability to control or determine what other products might be used as a part of or in conjunction with equipment supplied by the OEM. Admiral Sargent will testify and offer opinions that vendors would not have been permitted, under the specifications, associated regulations and procedures, nor under the actual practice as it evolved in the field, to control, to determine, or to influence the manner in which its product would be used, handled, installed, modified, repaired, or incorporated into shipboard systems.

### ORIGINAL EQUIPMENT VS. REPLACEMENT PRODUCTS.

Admiral Sargent will further testify with respect to the methods, manner and procedures for maintaining and repairing equipment and products aboard U.S. Government vessels. Such testimony will include, by way of example: the general maintenance and repair requirements on a Navy vessel; a description of the forces (i.e., crew, auxiliary, shipyard, or other forces) generally used to effectuate maintenance and repair under a variety of circumstances, including extraordinary conditions associated with combat damage; where Navy personnel are involved, the identity and description of the rates and ratings of the crew trained and designated to perform such functions; and the use of and exposure to asbestos-containing materials, particularly insulation materials, in the performance of such tasks.

Admiral Sargent will also testify that OEMs were not necessarily also the suppliers of replacement materials used in the maintenance or repair of the equipment aboard ship. For example, the OEM of a pump would likely not be the OEM or supplier of the replacement gasket or packing materials used to maintain or to repair the pump. Thus, replacement of the original asbestos-containing products within the equipment would be accomplished with products from other suppliers- not the OEM. He will testify that the Navy did not consult

OEMs regarding the supply of replacement materials, such as asbestos-containing products that might be used in connection with that equipment. Admiral Sargent will offer testimony and opinions with respect to the period of time in which packing and gaskets originally supplied by an OEM would likely remain with the OEMs equipment given the particular circumstances based on plaintiffs testimony, his shipboard service, and the ships' relevant service records.

Similarly, Admiral Sargent will testify that OEMs were not necessarily the suppliers of insulation products applied to the OEM's equipment by the Navy after installation. Thus, other suppliers -not the OEM-provided insulation products that may have been used in relation to the original equipment, including pumps. He will testify that the Navy did not consult OEMs regarding the use or installation of insulation materials to be used in connection with that original equipment. Moreover, not only did the OEM not have any control over the type and quantity of insulation product to be used in conjunction with its original equipment, the OEM could never be certain that any insulation would, in fact, be applied to the original equipment due to the variety of circumstances and potential uses of the original equipment.

### EXPOSURE TO ASBESTOS PRODUCTS.

Admiral Sargent will provide opinions and testimony regarding plaintiff/decedent's actual and potential exposure to asbestos through his work, generally, as well as his actual and potential exposure to asbestos aboard specific ships, if any, identified in plaintiffs discovery. In so doing, he may also rely on the testing performed by other experts, as well as data and literature available with respect to the asbestos-containing products at issue in this case.

Admiral Sargent's testimony may include, by way of example, a general statement of the types of asbestos encountered aboard ships; the quantities of asbestos found aboard ships; and a quantitative comparison or the types of asbestos or asbestos uses aboard ships. As noted above, Admiral Sargent may prepare or refer to demonstrative exhibits in connection with his testimony and opinions on these subjects.

In addition to plaintiff/decedent's exposure to asbestos-containing insulation products during his naval service, Admiral Sargent may also testify regarding his alleged exposures, if any, to products manufactured or supplied by Mundet Cork, which products may have included some quantity of asbestos fibers as a component part. To the extent there ever were any Mundet Cork products aboard vessels, including any vessels on which plaintiff worked, Admiral Sargent will discuss the historical uses, operations, and handling of such products.

### CONCLUSION.

This disclosure is based on the information available to Admiral Sargent at this time. Should any additional information become available, he reserves the right to determine the impact, if any, of the new information on his opinions and conclusions, and to revise his opinions and conclusions if necessary. Further, he may respond to opinions offered by any

other experts and/or fact witnesses relating to any subject matter that pertains to his specialty or area of expertise and experience.

M) DORSETT SMITH, M.D., F.A.C.P., F.C.C.P., F.A.C.O.E.M.

Dr. Smith is expected to testify regarding a historical review and state of art of medical knowledge and asbestos-related conditions and exposures in general and particularly mesothelioma, including what information might have been included in any warning about the use of asbestos insulation products during the time period of Decedent's alleged exposure to Mundet Cork products and the likelihood that Decedent was exposed to levels of asbestos that would have prompted any health concern based on information available at the time. He will offer opinions as to the general awareness about asbestos-related disease and the various work forces at risk at various times and the relative significance from a medical perspective of various exposures to the causation of Decedent's death.

N) PATRICK SZMYT, SENIOR VICE PRESIDENT OF FINANCE AND C.F.O. FOR CROWN, CORK & SEAL, U.S.A. INC.

Mr. Szmyt is expected to testify regarding the financial aspects of Crown Cork's acquisition of Mundet Cork Corporation and of Mundet's lines of business at the time Crown Cork acquired Mundet stock. Mr. Szmyt is being offered for deposition by telephone.

Crown reserves the right to adopt the testimony of any and all experts identified by other defendants in this case, to the extent the testimony of said expert is not inconsistent with the defenses asserted by Crown.

Crown reserves the right to call all treating and/or consulting physicians identified in discovery and reserves the right to call any individual with knowledge of the physical or mental condition of the plaintiff.

Crown further identifies all witnesses named by any other party and reserves the right to call any such witness in its case.

O) JOSEPH D. WENDLICK, CIH

Mr. Wendlick is a Certified Industrial Hygienist with knowledge and experience in the area of occupational exposure to asbestos containing products. Mr. Wendlick is expected to testify about the state of industry knowledge concerning asbestos health hazards; industrial hygiene and industrial hygiene practices; the determination of Plaintiff/Decedent's total asbestos exposure; a retrospective exposure analysis; determination of Decedent's exposure to a particular company's products and to all asbestos products; the identification of fiber types in products encountered by Plaintiff/Decedent; work practices that may involve liberation of asbestos fibers; quantification of exposure to asbestos in different trades; an explanation and history of threshold limit values for asbestos; a description of how dust measurements are done at job sites; the levels of exposure to asbestos known to be associated with asbestos-caused diseases; the levels of exposure below which it is thought

that asbestos–related diseases will not develop; industrial hygiene literature and medical literature which support that threshold; the work practices in preparing and applying asbestos-containing materials, including asbestos-containing materials and the amounts of dust emitted by each of those operations, based on his experience and his review of the industrial hygiene literature; the methods of identifying fiber types in products; the ability of fibers to remain airborne or settle; factors affecting the transport and settlement of givers; and the effects of control technology on exposures.

Mr. Wendlick may also testify regarding articles that reconstruct the exposures experienced by insulators, other shipyard and construction trades and bystanders.

(P) Plaintiff                                      Liability and Damages

(Q) Plaintiff's employers                          Liability and Damages

(R) Plaintiff's medical providers                  Liability and Damages

(S) And all other individuals who continuing discovery will reveal.

**b)    A copy of or description by category and location of, all documents, electronically stored information, and tangible things that are in the possession, custody or control of the disclosing party, and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.**

RESPONSE:  Crown Cork & Seal Company, Inc. does not posses sufficient information pertaining to plaintiff's claims to identify specific documents, information or tangible things that it may use to support its claims or defenses in this matter.

Defendant discloses and incorporates herein by reference all other Rule 26(a) disclosures by any other party in this matter.  Defendant reserves its right to disclose additional documents and tangible items or their identify, if their identity is later determined.

**c)    A computation of any category of damages claimed by the disclosing party, and the non-privileged or protected from disclosure documents on which such computation is based.**

RESPONSE:  Not applicable.

**d)    Any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgement which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

RESPONSE:  Not applicable.  Crown Cork & Seal Company, Inc. has no insurance coverage to indemnify it in this action.

Defendant discloses and incorporates herein by reference all other Rule 26(a) disclosures by any other party in this matter.

Upon information and belief, formed after reasonable inquiry, the foregoing initial disclosures are complete.  Defendant will supplement the disclosures pursuant to Federal Rule of Civil Procedure 26.

Defendant reserves the right to modify or supplement its responses upon discovery of further information, and makes these disclosures without prejudice to introduce at trial any evidence that is subsequently discovered.

        Respectfully submitted,

        THOMSON, RHODES & COWIE, P.C.

        s/ Lisa R. Whisler
        Lisa R. Whisler
        PA 312032
        Email: lrw@trc-law.com

        Firm #720
        1010 Two Chatham Center
        Pittsburgh, PA  15219
        Phone (412) 232-3400
        Fax # (412) 232-3498

        Attorneys for Crown Cork & Seal Co., Inc.

W:\RER\Philadelphia\Individual cases\McAfee, Kenneth\Initial Disclosures-McAfee.doc