UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: ASBESTOS PRODUCTS
LIABILITY LITIGATION (NO. VI)                          MDL DOCKET NO. 875

This Document Relates To:

_____
KENNETH McAFEE and SHIRLEY McAFEE,  )
                                    )
Plaintiffs,                         )
                                    )
v.                                  )    C.A. No. 5:13-06856-ER
                                    )
CBS CORPORATION, *et al.*,          )
                                    )
Defendant(s).                       )
_____ )

### CBS CORPORATION'S RESPONSE TO THIS COURT'S
### NOVEMBER 12, 2014 SHOW CAUSE ORDER

CBS Corporation ("Westinghouse")[1] hereby responds to this Court's Show Cause Order, seeking input as to whether the passage of time and/or changed circumstances counsel in favor of discontinuing its practice of severing punitive damage claims, of retaining jurisdiction over such claims, and of holding them in abeyance unless and until it can be ascertained that assets are available to compensate future asbestos claimants for their injuries. As framed by this Court, the question at hand is not the *substantive* question of whether the punitive damage claim against Westinghouse in this case is merited;[2] the question is *procedural*, asking whether this Court's

---

[1] CBS Corporation (a Delaware corporation f/k/a Viacom, Inc.) is a successor by merger to CBS Corporation (a Pennsylvania corporation f/k/a Westinghouse Electric Corporation).

[2] Ultimately, the punitive damage claim stated against Westinghouse here will pose a substantive law question, among others, as to whether a punitive damage claim can be stated in conjunction with a maritime law-based "unseaworthiness" personal injury claim involving a seaman. While acknowledging this Court's conclusion in *In re Asbestos Prods. Liability. Litig. (No. VI) [Sanchez]*, 2014 WL 3353044 at *10 (E.D. Pa. July 9, 2014) that such a claim is not necessarily precluded by *Miles v. Apex Marine Corp.*, 498 U.S. 19, 36 (1990), Westinghouse respectfully notes that substantial ground for disagreement exists. See generally *McBride v. Estis Well Serv.*, 768 F.3d 382 (5th Cir. 2014). Consistent with the parameters of this Court's Show Cause Order, however, that substantive question is not taken up here.

Westinghouse is compelled to note, however that Plaintiffs' Show Cause Order response primarily champions the purported substantive merits of their punitive damage claims against various defendants rather than

discretionary severance and retention of punitive damage claims – which has been endorsed by both the Judicial Panel on Multidistrict Litigation and the Third Circuit Court of Appeals – should continue.

Westinghouse respectfully suggests that this substantive/procedural distinction is key to resolving the question posed by this Court. In *Sanchez*, this Court acknowledged the myriad of factors which seriously erode the public policy justifications for punitive damage awards in today's asbestos litigation, yet ultimately determined that – as a question of ***substantive*** law – such concerns did not justify foreclosing any possibility of such an award ever being had on its merits. *Sanchez*, however, did not reach the separate ***procedural*** question posed here – *i.e.*, whether those same factors do, in fact, counsel in favor of severing punitive damage claims, and retaining jurisdiction to consider such claims at some future date if it can be ascertained that sufficient assets have been preserved to afford future asbestos claimants an opportunity to obtain compensation for their injuries.[3]

---

addressing the procedural question posed by this Court. As to Westinghouse, Plaintiffs rely on two documents tending to show that Westinghouse took steps in the 1950s to warn and protect employees engaged in the specific task of fabricating asbestos-containing blankets, urging that these documents show that Westinghouse knew of hazards associated with that process yet failed to warn product end-users. (*Plaintiffs' Response*, Exhibits L and M).

   As research has failed to uncover a reported decision from any jurisdiction in which punitive damages have been awarded relative to a product-related personal injury claim proceeding under a maritime theory of unseaworthiness, there is substantial uncertainty as to the legal standards which would apply to such a novel claim. In any event, and regardless of the precise test applied, mere proof of a lack of warning as to a known product hazard could, at most, support a claim of mere negligence and, thus, falls well short of showing the culpability needed to support a punitive damage claim. Compare *Olsen v. United States*, 521 F. Supp. 59, 69 (E.D. Pa. 1981). Also, it bears stressing that the alleged exposure in this case did not arise from the handling of ***asbestos-containing blankets*** but, rather, from the use of ***asbestos-containing wire***. As such, Plaintiffs' proposed evidence would raise significant constitutional concerns, as punitive damages cannot be used to punish a defendant for conduct dissimilar from that alleged to have caused injury in the case at hand. *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408 (2003). Finally, evidence that a defendant took some steps to warn of a hazard (no matter how limited or ineffectual) is generally fatal to any demand for punitive damages, as such evidence is antithetical to a finding of wantonness or conscious disregard. See, *e.g.*, *Toole v. McClintock*, 999 F.2d 1430, 1436 (11th Cir. 1993). In short, the very documents relied on by Plaintiffs tend to undermine their punitive damage claim against Westinghouse.
   [3] Westinghouse further submits that, even as to the ***substantive*** question of whether punitive damage claims should be absolutely foreclosed as a matter of law in asbestos cases, there may be grounds for this Court to reconsider its opinion. In reaching its conclusion in *Sanchez*, this Court noted the various factors suggesting that punitive damages no longer serve a valid deterrent effect in asbestos cases, but determined that an absolute preclusion of punitive damages in asbestos cases could not rest "solely" on this failure of deterrence. *Sanchez*, 2014 WL 3353044 at *15. Likewise, this Court noted the due process concerns raised by the possibility that asbestos

## Historical Context of this Court's Punitive Damages Procedure

Contemporaneous with MDL-875's formation, serious concerns began to arise that punitive damage awards posed a significant, and unjustifiable, risk to future asbestos claimants. Most notably, the Judicial Conference Ad Hoc Committee on Asbestos Litigation declared that:

> Although there may be grounds to support [a punitive damage] award, multiple judgments for punitive damages in the mass tort context against a finite number of defendants with limited assets threaten fair compensation to pending claimants and future claimants who await their recovery, and threaten the economic viability of the defendants.  To the extent that some states do not [sic] permit punitive damages, such awards can be viewed as a malapportionment of a limited fund. Meritorious claims may go uncompensated while earlier claimants enjoy a windfall unrelated to their actual damage.

*Report of the Judicial Conference Ad Hoc Committee on Asbestos Litigation*, at p. 32 (March 1991).

In light of these concerns, this Court acted to ensure the fair and equitable treatment of future claimants, securing the Judicial Panel on Multidistrict Litigation's authorization to sever punitive damages claims, and to retain jurisdiction over those claims even after associated compensatory damages claims had been remanded to a transferor court for trial. In *In re Collins*, 233 F.3d 809 (3d Cir. 2000), the Third Circuit Court of Appeals unreservedly endorsed this practice, expounding on the crucial public policies furthered thereby in the unique context of asbestos litigation.  As summarized by that court:

> The resources available to persons injured by asbestos are steadily being depleted. The continued filings of bankruptcy by asbestos defendants disclose that the process is accelerating.  ***It is responsible public policy to give priority to compensatory claims over exemplary punitive damage windfalls***; this ***prudent conservation*** more than vindicates the Panel's decision to withhold punitive damage claims on remand. It is discouraging that while the Panel and transferee

---

defendants could incur serial punitive damage awards in multiple cases, equating to repeated punishments for a single course of conduct but, again, held that punitive damages could not be precluded as a matter of substantive law "solely" because of this due process problem. *Id.*, at *13.  Westinghouse suggests that, even if none of the individual concerns noted by this Court would suffice to preclude punitive damage awards in asbestos cases when viewed in isolation, their combined synergistic effect counsels strongly in favor of such a preclusion. Once again, however, this substantive question need not be reached to resolve the procedural question posed by this Court's Show Cause Order.

court follows this *enlightened practice*, some state courts allow punitive damages in asbestos cases. ***The continued hemorrhaging of available funds deprives current and future victims of rightful compensation***.

*Id.*, at 810 (emphasis added). This Court has, on numerous occasions, reiterated its commitment to the important public policies served by its current procedural approach to punitive damage claims, stressing its belief, shared with the Third Circuit Court of Appeals, that "'[i]t is responsible public policy to give priority to compensatory claims over exemplary punitive damage windfalls.'" See, *e.g.*, *Ferguson v. Lorillard Tobacco Co.*, 2011 WL 4915784 at *1, n.2 (E.D. Pa. 2011) (quoting *In re Collins*, 233 F.3d at 810).

### Public Policy Underpinnings of this Court's Punitive Damages Procedure

As recently acknowledged by this Court in *Sanchez*, 2014 WL 3353044 at *12-13, a number of factors could rationally support a conclusion that punitive damage awards in asbestos cases are no longer consistent with public policy. See also Paul F. Rothstein, *What Courts Can Do in the Face of the Never Ending Asbestos Crisis*, 71 MISS. L. J. 1, 26 (2001) (concluding that "[c]ontinuing to award punitive damages in asbestos cases no longer makes sense"); R. Barclay Surrick, *Punitive Damages and Asbestos Litigation in Pennsylvania: Punishment or Annihilation?*, 87 DICK. L. REV. 265, 296 (1983) (opining that, "[b]alancing the benefits to be derived from continued imposition of punitive damages against the social and economic consequences of such a course of action, it appears that the continued imposition of punitive damages simply cannot be justified"). Perhaps most notably, punitive damages no longer serve their intended purpose relative to asbestos claims.

Simply put, "punitive damages are aimed at punishing and deterring particularly egregious conduct," not at fairly compensating injured parties for their harm. *Sanchez*, 2014 WL 3353044 at *11. However, asbestos products have not been widely manufactured or sold in the United States for decades, raising serious questions as to what current or future conduct a

4

punitive damage award in today's asbestos litigation would serve to deter. See generally *Dunn v. Hovic*, 1 F.3d 1371, 1396 (3d Cir. 1993) (Weis, J., dissenting); *Sanchez*, 2014 WL 3353044 at *12. Specifically to this point, it has been decades since CBS Corporation has manufactured industrial products of any type, as the Company is now exclusively a media and entertainment concern.

Further, and even if it is urged that punitive damages could potentially deter the future manufacture and sale of other types of defective products, it is difficult to discern what additional deterrence is needed (or could prove effective) given the millions of dollars of damages (both compensatory and punitive) already awarded to asbestos claimants and the related bankruptcies of scores of asbestos defendants. *Dunn*, 1 F.3d at 1396 (Weis, J., dissenting) ("the avalanche of compensatory claims against asbestos manufacturers has surely served as more of a punishment and deterrent than individual punitive assessments in isolated cases against manufacturers of other types of products"). See also *Sanchez*, 2014 WL 3353044 at *12. Or, as framed in *Jackson v. Johns-Manville Sales Corp.*, 727 F.2d 506, 527 (5th Cir. 1984), *vacated*, 750 F.2d 1315 (5th Cir. 1985):

> The significance of punitive damages as a deterrent depends upon the size of the penalty increase relative to the "base penalty" exacted by strict liability compensatory awards. Because of the dimensionless character of the prospects for future litigation in this instance, the "base penalty," for all practical purposes, is illimitable. Correspondingly, the significance of punitive damages as a deterrent diminishes to the vanishing point.

This latter factor is especially key as, "when retribution and deterrence are accomplished without the imposition of punitive damages, use of that weapon is no longer justified." *Dunn*, 1 F.3d at 1396 (Weis, J., dissenting). Unfortunately, punitive damage awards in asbestos cases are not simply pointless; they are, instead, wholly counterproductive.

A primary concern raised by punitive damage awards in asbestos cases involves the depletion of limited assets which would otherwise be available to compensate future claimants

5

for their injuries. As summarized in the February 26, 1992 testimony of Judge William H. Schwarzer, Director of the Federal Judicial Center, before a United States House of Representatives Subcommittee:

> ***Punitive damages compete with compensatory damages for the increasingly scarce resources of asbestos defendants and their insurers.*** Until the claims of future claimants become liquidated, distribution of punitive damages to current claimants creates a risk of exhausting funds before potential claimants discover their injuries. Some mechanism to avoid this outcome, at least until more precise information becomes available about future claims, may be necessary for a national solution that has meaning for future claimants.

*Asbestos Litigation Crisis in Federal and State Courts: Hearings Before the Subcomm. On Intellectual Property and Judicial Administration of the House Comm. on the Judiciary*, 102d Cong., 2d Sess. 132-33 (1992) (hereafter "*Schwarzer Testimony*") (emphasis added). Or, as observed by Judge Weis of the Third Circuit Court of Appeals:

> Every dollar expended on punitive awards, as well as those expended in compensatory damages, will diminish, eventually to the point of exhaustion, resources available for paying future plaintiffs' claims. There is, however, an important distinction. Compensatory damages are a remedy for injuries suffered. Punitive awards are not.

*Dunn*, 1 F.3d at 1399 (Weis, J., dissenting).

In short:

> If earlier-filing claimants are able to obtain windfall punitive damages awards, then assets are depleted and may become exhausted due to the length and enormity of asbestos litigation, jeopardizing tort recoveries for later-filing claimants with mesothelioma, asbestos-related lung cancer, or debilitating asbestosis.

Mark A. Behrens & Cary Silverman, *Punitive Damages in Asbestos Personal Injury Litigation: The Basis for Deferral Remains Sound*, Vol. 8:1 RUTGERS J. LAW & PUB. POL'Y 50, 51 (2011) (hereafter "*Basis for Deferral Remains Sound*"). See also JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION, REPORT ON ASBESTOS LITIGATION 32 (Mar 1991).

In addition to this risk of depletion of funds needed to compensate future claimants, punitive damage claims in the asbestos litigation context pose a significant "multiple punishments problem," with a single defendant placed in jeopardy of serial awards of punitive damages, all purporting to punish the same long-past conduct. See generally *Sanchez*, 2014 WL 3353044 at *13. Cf. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003); *Planned Parenthood of Columbia/Willamette Inc. v. American Coalition of Life Activists*, 422 F.3d 949, 959 (9th Cir. 2005). The reality of this due process threat is, in fact, evidenced by the "proof" offered by Plaintiffs here as supporting their punitive damage claim against Westinghouse – *i.e.*, documents relating to Westinghouse's non-case-specific conduct which are not in any way linked to the particular injury in this case.

Notably, the risk of additional future bankruptcies fueled by such serial punitive damage awards does not simply threaten the resources available to compensate future claimants for their injuries. Rather:

> Punitive awards that are made today. . . punish corporate defendants over and over again for transgressions that occurred thirty to sixty years ago. Payment of those awards not only jeopardizes the ability to provide compensation for future plaintiffs, but also, by forcing companies into bankruptcy, injures employees, customers, and trade creditors who took no part in, and had no knowledge of, the wrong doing.

*Dunn*, 1 F.3d at 1403 (Weis, J., dissenting).

**Continued Need for this Court's Punitive Damages Procedure**

In short, there can be little dispute that this Court, the Judicial Panel on Multidistrict Litigation, and the Third Circuit Court of Appeals were correct that – at least through the date of decision in *Collins* in 2000 – this Court's procedural handling of punitive damage claims was not simply proper; it was an essential aspect of the mission of MDL-875. **Even as late as July of this year**, this Court stressed that this procedure was "responsible public policy." *Sanchez*, 2014 WL 3353044 at *1, n.1. Cf. *Ferguson*, 2011 WL 4915784 at *1, n.2. This Court's Show Cause

7

Order now asks whether the passage of time and/or changed circumstances justifies a different conclusion. The answer to that question is clearly "no."

It cannot be disputed that – given both the diligence of this Court and the decision to no longer transfer asbestos claims pending in federal court for inclusion in MDL-875 – the number of cases pending in MDL-875 has dramatically decreased.[4] However, viewed as a whole, the asbestos litigation retains its unprecedented vigor and scope, with the filing of new claims for asbestos-related mesotheliomas anticipated to continue for decades. *Basis for Deferral Remains Sound*, at p. 52. In sum, even in terms of the "new" asbestos litigation, the volume of claims remains substantial, particularly given the ever-increasing percentage of those claims which involve malignancies.[5]

One notable change has marked the "new" asbestos litigation. That change, however, counsels heavily in favor of the continuance of this Court's procedural approach to punitive damage claims.

More specifically, the defendants who would be burdened with punitive damage claims today are very different from the defendants who were before this Court when it initiated the severance of punitive damages claims in 1991. Due to the continued tide of asbestos-related bankruptcies,[6] "the net has spread from the asbestos makers to companies far removed from the

---

[4] As of October 31, 2014, 2,730 cases remained pending in MDL-875, 2,644 of which were included in this Court's maritime docket or "MARDOC."

[5] Towers Watson & Co., a notable risk management firm, has estimated that approximately *28,000 additional mesothelioma claims* will be filed in the future. *A Synthesis of Asbestos Disclosures from Form 10Ks – Updated*, at p.1 (June 2013).

[6] It bears stressing that asbestos bankruptcies are not a thing of the past and that, over the last decade and a half, dozens more companies have sought bankruptcy protection due to unmanageable asbestos liabilities, further shrinking the pool of compensation available to future claimants. See William P. Shelley, *et al.*, *The Need for Transparency Between the Tort System and Section 524(g) Asbestos Trusts*, 17 NORTON J. BANKR. L. & PRAC. 257, 257 (2008). In fact, there has been, and continues to be, a "snowball" effect; as once-peripheral defendants are forced to indemnify against a more and more disproportionate share of the total asbestos liability due to the bankruptcy of the former major players in the asbestos industry, "the once peripheral defendant corporations follow[] the target defendants into bankruptcy." Deborah R. Hensler, *Asbestos Litigation in the United States; Triumph and Failure of the Civil Justice System*, 12 CONN. INS. L. J. 255, 272 (2006). Westinghouse respectfully submits that "[a]ctions taken by [this Court] that could accelerate this process would be irresponsible absent a clear

scene of any putative wrongdoing." Editorial, *Lawyers Torch the Economy*, WALL ST. J., Apr. 6 2001 at A14. See also *Medical Monitoring and Asbestos Litigation – A Discussion with Richard Scruggs and Victor Schwartz*, 17-3 MEALEY'S LITIG. RPTR.: ASBESTOS 19 (Mar. 1, 2002) (quoting a notable former asbestos claimants' attorney as acknowledging that asbestos litigation has devolved into an "endless search for a solvent bystander"). As a result, the burden of today's punitive damage claims would perversely fall on "peripheral defendants who [unlike the now-bankrupted asbestos industry members] have generally not engaged in conscious, flagrant wrongdoing," ***effectively punishing them for their continued solvency*** arising from their primarily non-asbestos-related activities, ***not for their relative culpability*** arising from their lesser past involvement in asbestos-related activities. Victor E. Schwartz *et al.*, *A Letter to the Nation's Trial Judges: Serious Asbestos Cases – How to Protect Cancer Claimants and Wisely Manage Assets*, 30 AM. J. TRIAL ADVOC. 295, 327-28 (2006). See also *Dunn*, 1 F.3d at 1405 (Weis, J., dissenting).

It bears stressing that this Court cannot blindly hope that this relative lack of culpability on the part of many of today's asbestos defendants will, in and of itself, serve as an effective hedge against punitive damage claims-driven depletion of the limited funds available to compensate future claimants. Particularly given the increased decentralization of asbestos litigation inherent in the cessation of transfers of cases for inclusion in MDL-875, "forum shopping" by asbestos claimants presents a significant risk that today's asbestos defendants' liability will bear no rational relationship to their relative culpability; claimants will elect to pursue their claims in jurisdictions which have proven to be relatively lax in ferreting out the fraud and overreaching which have been unfortunate, but constant, hallmarks of the asbestos litigation. Cf. *Basis for Deferral Remains Sound*, at pp. 66-67, n. 74.

---

and compelling justification that does not exist with respect to the awarding of punitive damages in modern asbestos cases." *Basis for Deferral Remains Sound*, at p. 65.

Experience has, in fact, taught that, even separate and apart from the question of punitive damages, today's asbestos litigation does not tend to closely correlate liability and culpability, causing a disproportionate drain of valuable assets which might otherwise be available to compensate future claimants. See generally *In re Garlock Sealing Techs.*, 504 B.R. 71 (W.D.N.C. 2014). Additionally, even where a ruling on the substantive merits of an individual punitive damage claim is never had from a court:

> the potential for punitive damages is a weighty factor in settlement negotiations and inevitably results in a larger settlement than would ordinarily be obtained. To the extent that this premium exceeds what would otherwise be a fair and reasonable settlement for compensatory damages, assets that could be available for satisfaction of future compensatory claims are dissipated.

*Dunn*, 1 F.3d at 1396 (Weis, J., dissenting) (citing *Schwarzer Testimony*, at 137-38).

Nor can this Court blindly trust in the seeming economic vitality of many of the entities who have only recently become "target" defendants due to the bankruptcy of true asbestos-industry defendants. Nowhere is that truism more vividly reflected than in the *Dunn* majority's ironic reliance on Owens-Corning Fiberglas Corporation's robust economic health in letting a punitive damage award stand against it. Specifically, the *Dunn* majority stressed that Owens-Corning Fiberglas – as of 1993 – had not adequately demonstrated its inability to withstand combined punitive and compensatory awards in the future given "approximately $1.26 ***billion*** in unexhausted insurance coverage," robust annual earnings of as much as $50 million per year, and cash reserves in excess of $130 million. *Dunn*, 1 F.3d at 1390 (emphasis in original). Given the benefit of hindsight, we now know that those seemingly ample resources could not keep Owens-Corning Fiberglas Corporation from being driven into bankruptcy by its asbestos liabilities only seven years later, seriously diminishing the pool of assets available to asbestos claimants seeking compensation for their injuries at that time. As aptly summarized in this regard by Judge Weis:

> Predictions of future events, of course, always carry some risk of error. In this instance, however, the storm warnings are too foreboding to be brushed aside.

10

Absolute certainty likely will appear only after disaster has struck – when the time for effective anticipatory action has vanished. *If there is to be error in forecasting, I would prefer that it be in favor of redress for future claimants, rather than largesse for those who have received adequate relief.*

*Dunn.* 1 F.3d at 1399 (Weis, J., dissenting) (emphasis added).

## Conclusion

Unfortunately, what was true yesterday remains true today: the asbestos litigation confronts this Court and litigants with "burgeoning litigation, corporate collapse, and future compensatory inadequacy." *Dunn*, 1 F.3d at 1398 (Weis, J., dissenting). Thus, "[i]f asbestos litigation reforms are undone or weakened, then the problems of the past may return. Courts must continue to enforce policies that preserve assets for those unfortunate individuals who will develop an asbestos-related impairment in the future." *Basis for Deferral Remains Sound*, at p. 67.

In particular, it is important to end as we began – by being mindful of the crucial distinction between an ultimate determination of asbestos-related punitive damage claims on their *substantive* merits (as considered and rejected in *Sanchez*), and the entirely different question of the continued vitality of this Court's *procedural* handling of such claims (as posed by the current Show Cause Order).[7] While a public policy-driven absolute and permanent preclusion of all asbestos-related punitive damage claims on their substantive merits might more properly be undertaken by legislatures rather than courts, the election to continue to exercise clear judicial discretion to procedurally sever such claims and hold them in abeyance unless and until fair compensation for future claimants can be assured rests solely and squarely with this

---

[7] This dichotomy is, in fact, embodied in Third Circuit Court of Appeals precedent. More specifically, it bears noting that the Third Circuit's 1993 decision in *Dunn* declining to strike down an asbestos-related punitive damage award as a matter of *substantive* law (giving rise to Judge Weis' forceful dissent) stands in stark contrast to its 2000 decision in *Collins*, which was authored by Judge Weis, and which wholeheartedly endorsed this Court's *procedural* decision to sever punitive damage claims, to retain jurisdiction over those claims, and to hold them in abeyance unless and until future claimants have been assured adequate and fair compensation for their actual injuries.

Court. In short, this Court's use of a procedure resting squarely within its discretion to protect future claimants is not improper "judicial activism," but its failure to do so would amount to a destructive form of "judicial paralysis," threatening MDL-875's hard-won legacy of "responsible public policy." Cf. *Dunn*, 1 F.3d at 1399 (Weis, J., dissenting).

Dated: November 25, 2014                     Respectfully submitted,

/s/ Christopher G. Conley
Christopher G. Conley
Georgia Bar No. 181090
Admitted *Pro Hac Vice* – MDL No. 875
EVERT WEATHERSBY HOUFF
3455 Peachtree Road NE, Suite 1550
Atlanta, Georgia 30326
(706) 389-7311
cgconley@ewhlaw.com

and

/s/ John P. McShea
John P. McShea
McSHEA LAW FIRM, P.C.
Centre Square, West Tower
1500 Market Street, 40th Floor
Philadelphia, PA 19102
(215) 599-0800
jmcshea@mcshealawfirm.com

Attorneys for CBS Corporation

## **CERTIFICATE OF SERVICE**

This is to certify that on this 25th day of November, 2014, a true and correct copy of the foregoing Defendant CBS Corporation's Response to This Court's November 12, 2014 Show Cause Order was served on all counsel of record, *via electronic filing*.

Robert E. Paul, Esquire
Paul Reich & Myers
1608 Walnut Street, Suite 500
Philadelphia, PA 19103

and

Defense Counsel of Record


/s/ John P. McShea
John P. McShea